1  BILL LOCKYER, Attorney General
    of the State of California
2  ALBERT NORMAN SHELDEN
    Senior Assistant Attorney General
3  BENJAMIN G. DIEHL (Ca. Bar No. 192984)
    Deputy Attorney General
4  300 S. Spring Street, Suite 1702
   Los Angeles, CA  90013
5  Telephone: (213) 897-5548
   Facsimile: (213) 897-4951
6
   WAYNE STRUMPFER
7  Acting California Corporations Commissioner
   ALAN S. WEINGER
8  Acting Deputy Commissioner
   JUDY L. HARTLEY (Ca. Bar No. 110628)
9  Senior Corporations Counsel
   320 W. 4th Street, Ste. 750
10 Los Angeles, California 90013-2344
   Telephone: (213) 576-7604
11
   THOMAS J. ORLOFF, District Attorney
12   County of Alameda
   CHRISTOPHER G. CARPENTER, Assistant District Attorney
13 LAWRENCE C. BLAZER (Ca. Bar No. 95598)
    Senior Deputy District Attorney
14 7677 Oakport Street, Suite 650
   Oakland, CA  94621
15 Telephone: (510) 569-9281

16 [Additional Attorneys For Plaintiff Listed on Following Page]
   Attorneys for Plaintiff
17

18        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
              **FOR THE COUNTY OF ALAMEDA**
19

20 THE PEOPLE OF THE STATE OF          Case No.: RG06260804
   CALIFORNIA, by the Attorney General, the
21 California Corporations Commissioner, and the   **PERMANENT INJUNCTION AND**
   District Attorneys of Alameda, Los Angeles,    **FINAL JUDGMENT**
22 Merced, Monterey, San Francisco, and San
   Mateo Counties,
23                    Plaintiff,
                  v.
24
   AMERIQUEST MORTGAGE COMPANY, a
25 Delaware corporation; ACC CAPITAL
   HOLDINGS CORPORATION, a Delaware
26 corporation; TOWN AND COUNTRY
   CREDIT CORPORATION, a Delaware
27 corporation; and AMC MORTGAGE
   SERVICES, INC., formerly known as Bedford
28 Home Loans, a Delaware corporation,

                  Defendants.

1 | ADDITIONAL COUNSEL FOR PLAINTIFF:

2 | STEVE COOLEY, District Attorney
County of Los Angeles
3 | THOMAS A. PAPAGEORGE (Ca. Bar No. 77690)
Head Deputy District Attorney
4 | STUART C. LYTTON (Ca. Bar No. 114241)
Deputy District Attorney
5 | Consumer Protection Division
201 N. Figueroa Street, Room 1200
6 | Los Angeles, CA 90012
Telephone: (213) 580-3319
7 | Facsimile: (213) 480-9420

8

9 | GORDON SPENCER, District Attorney
County of Merced
RICHARD S. MICHAELS (Ca. Bar No. 51940)
10 | Special Prosecutor
2222 "M" Street
11 | Merced, CA 95340
Telephone: (209) 725-3600
12 | Facsimile: (209) 725-3669

13

14 | DEAN D. FLIPPO, District Attorney
County of Monterey
DENINE GUY (Ca. Bar No. 145360)
15 | Deputy District Attorney
1200 Aguajito Road, Room 301
16 | Monterey, CA 93940
Telephone: (831) 647-7770
17 | Facsimile: (831) 647-7762

18

19 | KAMALA D. HARRIS
District Attorney of the City and County of San Francisco
JUNE D. CRAVETT (Ca. Bar No. 105094)
20 | Assistant District Attorney
732 Brannan Street
21 | San Francisco, California 94103
Telephone: (415) 551-9537
22 | Facsimile: (415) 551-9504

23

24 | JAMES P. FOX, District Attorney
County of San Mateo
JOHN E. WILSON (Ca. Bar No. 95602)
25 | Deputy District Attorney In Charge
Consumer & Environmental Protection Unit
26 | 400 County Center, 3rd Floor
Redwood City, CA 94063
27 | Telephone: (650) 363-4098

28

2

1        It appearing to this Court that Plaintiff the People of the State of California, by and

2    through the Attorney General, the California Corporations Commissioner, and the District

3    Attorneys of Alameda, Los Angeles, Merced, Monterey, San Francisco, and San Mateo Counties

4    ("Plaintiff," "the State" or "the State of California") and Defendants ACC Capital Holdings

5    Corporation ("ACCCH"), and its subsidiaries Ameriquest Mortgage Company ("AMQ"), Town

6    & Country Credit Corporation ("TCCC"), and AMC Mortgage Services, Inc., formerly known as

7    Bedford Home Loans (hereafter "AMC"), on behalf of themselves and their successors, assigns,

8    predecessors, and any future acquired or created corporations or other business entities of

9    ACCCH, AMQ, TCCC or AMC, engaged in the Retail Based origination and funding of real

10    estate secured, owner-occupied, residential mortgage loans, have resolved the matters in

11    controversy between them and have consented to the terms of this judgment, and good cause

12    having been shown, the Court hereby enters this Stipulated Permanent Injunction and Final

13    Judgment.

14    **I. DEFINITIONS**

15        For purposes of this Permanent Injunction and Final Judgment, the following Definitions

16    apply (capitalized terms used in a definition are themselves defined below):

17        **A.**    **"Adjustable Rate Mortgage"** means a Loan that has "a variable rate feature" as

18    used in 12 C.F.R. § 226.18(f).

19        **B.**    **"Ameriquest Party(ies)"** means, as the context requires, any ACCCH subsidiary,

20    including those acquired or formed in the future, involved in the Retail Based origination and

21    funding of real estate secured, owner-occupied, residential mortgage loans, and also including its

22    current Retail Based real estate lending subsidiaries AMQ, AMC and TCCC, and the respective

23    successors and assigns and all the respective employees, officers and directors (solely in their

24    respective official capacities during the term of their employment or directorship and not in their

25    individual capacities) of these subsidiaries.  This term does not include ACCCH or any

26    subsidiaries that are not involved in the Retail Based origination and funding of real estate

27    secured, owner-occupied, residential mortgage loans.

28

**C.** **"Annual Percentage Rate" and "APR"** mean the measure of the cost of credit expressed as a yearly rate, calculated according to the provisions of TILA.

**D.** **"Appraisal"** means a written or electronic analysis by an appraiser licensed or certified under the laws California or any other political subdivision of California to conduct Appraisals of the value or worth of a single-family or 1-4 unit residential property proposed to serve as collateral for a Loan. The term does not include reports that estimate the value of residential property by means of an Automated Valuation Model or AVM.

**E.** **"Appraisal Department"** means that department of an Ameriquest Party housing employees with responsibility for ordering and reviewing appraisals, which is located at the regional or headquarters office of the Ameriquest Party. It includes members of the Appraisal and Business Control Groups but does not include any employees who are Sales Personnel.

**F.** **"Borrower"** means an individual who has consummated a Loan with an Ameriquest Party.

**G.** **"Closing"** means the process during which a Borrower executes a note and security instrument regarding a lien on real property in connection with a Loan. In some Settling States a Closing is referred to as a "settlement" and in others as an "escrow."

**H.** **"Covered Transactions"** means any Loans originated by any Ameriquest Party during the period January 1, 1999 through and including December 31, 2005.

**I.** **"Debt Collector"** means a person or entity who is a debt collector as that term is defined at 15 U.S.C. § 1692a (6), and [insert applicable state law provision, if any].

**J.** **"Discount Points"** means fees or charges paid by the Borrower to an Ameriquest Party at the time of origination of a Loan for the purpose of reducing the interest rate applicable to the Loan.

**K.** **"District Attorneys"** means the District Attorneys of Alameda, Los Angeles, Merced, Monterey, San Francisco and San Mateo Counties, California.

**L.** **"Effective Date"** means March 21, 2006.

**M.** **"Financial Regulator"** means the administrative agency or agencies within any Settling State, which at any time between January 1, 1999 through and including December 31,

1    2005, exercised regulatory, licensing, examination, supervisory or other administrative

2    enforcement authority over the Ameriquest Parties with respect to any of the Covered

3    Transactions.

4        **N.**    **"Fixed Rate Mortgage"** means a Loan that is not an Adjustable Rate Mortgage.

5        **O.**    **"Good Faith Estimate" and "GFE"** mean an estimate of charges, prepared in

6    accordance with section 5 of RESPA, which a Borrower is likely to incur in connection with the

7    Closing of a proposed Loan.

8        **P.**    **"Independent Loan Closer"** means any person who is not an employee of the

9    branch office where the Loan is originated, a spouse, parent, sibling, or child of a branch office

10   employee, or a spouse of any such person, who has no financial interest in the Loan being closed

11   other than payment of standard settlement fees and charges, and who is present at the time of

12   Closing for the purpose of procuring the Borrower's execution of documents related to the

13   Closing process.

14       **Q.**    **"Lending Practices"** means any representations, misrepresentations, omissions,

15   disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral,

16   written or otherwise, by an Ameriquest Party, including its employees or agents, arising out of, in

17   connection with, or relating to any of the following:

18       **1.**    Loan types and terms, including Discount Points, interest rates,

19       origination-related fees, monthly payment amounts, terms of Adjustable Rate and

20       Fixed Rate Mortgages and Prepayment Penalties;

21       **2.**    Written disclosures, including the GFE and other documents

22       required to be provided to a Potential Borrower by any law or otherwise, provided

23       by an Ameriquest Party;

24       **3.**    The Borrower benefits of obtaining a Loan from an Ameriquest

25       Party or from a repeat Refinancing with an Ameriquest Party;

26       **4.**    Coordination with Debt Collectors;

27       **5.**    The timely completion of the Underwriting functions and funding

28       of a Loan;

1      **6.**     Closing of a Loan;

2      **7.**     Appraisals;

3      **8.**     Stated Income Loans; and

4      **9.**     Disclosures to non-English speaking Borrowers and Potential Borrowers,

5  including but not limited to the claims set forth in the Complaint filed in this matter, as well as

6  the matters referred to in Paragraph S of Section IV, below.

7      **R.**     **"Loan"** means a Retail Based, real estate secured, owner-occupied, residential

8  mortgage loan originated and funded by an Ameriquest Party.

9      **S.**     **"Material Change in Terms"** means:

10     **1.**     An increase in the interest rate of the Loan of thirty (30) basis

11 points or more or any increase in Discount Points, other than as the result of

12 trading Discount Points for interest rate at the affirmative request of the Borrower;

13     **2.**     Any increase in the repayment term of the Loan;

14     **3.**     A decrease in the Loan amount greater than one percent (1%);

15     **4.**     The addition of a Prepayment Penalty; or

16     **5.**     The change from a Fixed Rate Mortgage to an Adjustable Rate

17 Mortgage.

18     **T.**     **"Non-Prime Loan"** means a Loan for which the APR is equal to or greater than

19 two and one-half percentage points (2.5%) for first-lien loans or five percentage points (5%) for

20 subordinate-lien loans above the Treasury yield for securities of a comparable period of maturity

21 as of the fifteenth day of the month in which the interest rate on the Loan is set.  Following

22 receipt of the first Monitor's Report, due on March 31, 2007, and again upon receipt of the

23 second Monitor's Report, due on March 31, 2008, the Compliance Committee shall renegotiate

24 this provision in good faith with ACCCH and the Ameriquest Parties, taking into account the

25 Ameriquest Parties' record of compliance reflected in the Monitor's Reports and any other

26 relevant information.

27     **U.**     **"Potential Borrower"** means an individual who is seeking or receiving

28 information about a Loan from an Ameriquest Party Sales Person; provided, however, that

PERMANENT INJUNCTION AND FINAL JUDGMENT

1    Potential Borrower does not include an individual who receives, but does not respond to,

2    marketing materials or information, including advertisements.

3         **V.**     **"Prepayment Penalty"** means a fee assessed, pursuant to the terms of the Loan

4    documents, when a Borrower pays off a Loan within a designated period of time after Closing,

5    but excluding any fee or charge that may be assessed to facilitate Loan pay-off, such as a pay-off

6    fee, fax fee, reconveyance fee or other fee that is not prohibited under applicable law and would

7    be payable for the pay-off of any Loan without regard to whether the Loan documents impose

8    what generally is understood to be a Prepayment Penalty.

9         **W.**     **"Refinance"** means to satisfy one Loan with the proceeds from a new Loan

10   obtained by the same Borrower(s), using the same property as security. A Refinance does not

11   include the matters identified in 12 C.F.R. § 226.20(a)(1)-(5).

12        **X.**     **"RESPA"** means the federal Real Estate Settlement Procedures Act of 1974, 12

13   U.S.C. § 2601 et seq., and Regulation X, promulgated pursuant thereto, 24 C.F.R. Part 3500,

14   including subsequent amendments.

15        **Y.**     **"Retail Based"** means originated and funded by loans by employees or

16   independent contractors acting in the name and on behalf of the lender directly to consumers. It

17   does not include other methods of originating loans using third parties, such as mortgage brokers

18   or loan correspondents.

19        **Z.**     **"Sales Person"** or **"Sales Personnel"** means any employee or employees who

20   work in the AMC Portfolio Retention Department, at a branch office of any Ameriquest Party or

21   who otherwise may reasonably be foreseen to have direct communications (whether in person,

22   telephonically, or by electronic means) with Potential Borrowers for the purpose of originating a

23   Loan and those who supervise those employees, including regional and area managers.

24        **AA.**     **"Settlement Fund"** means the amounts required to be paid under this Judgment

25   for consumer restitution and administration.

26        **BB.**     **"Settling States"** means the States or Commonwealths, including the District of

27   Columbia, that file fully executed Consent Judgments or Stipulated Judgments, or comparable

28   documents, resolving with ACCCH and the Ameriquest Parties the matters set forth herein.

1      **CC.**    **"State Attorneys General"** means the chief legal officer of each state,

2  commonwealth and the District of Columbia, except for the states of Hawaii and Georgia.  For

3  Hawaii, it means the Executive Director of the Hawaii Office of Consumer Protection, an agency

4  with statutory authority to represent the State of Hawaii in Consumer Protection Actions.  For

5  Georgia, it means the Administrator of the Fair Business Practices Act, who is authorized by

6  statute to enter into Settlement Agreements on behalf of the State of Georgia.

7      **DD.**    **"Stated Income Loan"** means a Loan where a Borrower is not required to

8  provide verification or documentation to support all income listed on the Borrower's application.

9      **EE.**    **"TILA"** means the federal Truth-in-Lending Act, 15 U.S.C. §1601 et seq., and

10  Regulation Z, promulgated pursuant thereto, 12 C.F.R. Part 226, including subsequent

11  amendments.

12      **FF.**    **"Underwriting"** means the process of approving or denying a Loan based on an

13  evaluation of the applicant's creditworthiness and ability to repay the Loan and an Appraisal of

14  the market value of the residential property proposed to secure the Loan.

15  **II. STIPULATED RECITALS**

16      **A.**    Plaintiff, as well as state attorneys general and state financial regulators in other

17  states, has received and investigated consumer complaints, and conducted examinations with

18  respect to the Lending Practices of the Ameriquest Parties and acknowledges that ACCCH and

19  the Ameriquest Parties cooperated with Plaintiff and the other Settling States' investigations and

20  examinations of the Lending Practices.

21      **B.**    ACCCH and the Ameriquest Parties deny each of Plaintiff's allegations. This

22  Permanent Injunction and Final Judgment shall not be interpreted as an admission of wrongdoing

23  by ACCCH or the Ameriquest Parties or as an admission, concession, or evidence of any alleged

24  fault, misrepresentation, act or omission or any other alleged violation of law, and it does not

25  represent a formal finding of wrongdoing by any court or administrative agency.

26      **C.**    Plaintiff and Defendants waive their right to move for a new trial or otherwise

27  seek to set aside the Judgment through any collateral attack, and further waive their right to

28

1  appeal from the Judgment, except that Plaintiff and Defendants, and each of them, agree that this

2  Court shall retain jurisdiction for the purposes specified in paragraph VIII(H) of this Judgment.

3

4  **III. PAYMENT OF RESTITUTION, ATTORNEYS' FEES, INVESTIGATION COSTS AND OTHER EXPENSES.**

5

6      **A.    Payment Obligation of ACCCH.**  ACCCH is a party to this Permanent

7  Injunction and Final Judgment for the sole purpose of paying restitution and other amounts as set

8  forth below in this Section III and in Sections V.C.3 and VI.E.

9      **B.    Payment of Restitution.**  ACCCH or AMQ shall pay the sum of Two Hundred

10  Ninety-Five Million Dollars ($295,000,000) for the payment of restitution to Borrowers in the

11  Settling States nationally.  The restitution awarded under the terms of this Judgment is not and

12  shall not be considered as forgiven debt.  The Settlement Fund shall be divided into two

13  sub-funds:

14      **1.**    The sum of One Hundred Seventy-Five Million Dollars ($175,000,000) shall be

15          used to provide restitution to Borrowers who obtained Loans from an Ameriquest

16          Party during the period of January 1, 1999 to April 1, 2003 ("Sub-Fund A").

17          Sub-Fund A, together with accrued net after-tax income, if any, shall be

18          distributed on a nationwide basis by the Settlement Administrator to certain

19          Borrowers, including certain Borrowers in California, who received a Loan from

20          any of the Ameriquest Parties from January 1, 1999, through and including April

21          1, 2003, according to a formula to be established by the Settling States.

22      **2.**    The sum of One Hundred Twenty Million Dollars ($120,000,000) shall be used to

23          provide restitution to Borrowers who obtained Loans from an Ameriquest Party

24          between January 1, 1999 and December 31, 2005 ("Sub-Fund B").  The State of

25          California's share of  Sub-Fund B shall be Twenty-Six Million, Six Hundred

26          Thirty-Six Thousand and Four Hundred Dollars ($26,636,400.00), plus any net,

27          post-tax interest earned on that sum. The Settlement Administrator shall, at the

28          joint instruction of the California Attorney General and the Alameda County

1  District Attorney, transfer a portion, not to exceed Four Million Dollars

2  ($4,000,000) of the State of California's share of Sub-Fund B designated by the

3  Attorney General and the Alameda County District Attorney to the California

4  Attorney General's Office for later distribution as directed by the Attorney General

5  and the Alameda County District Attorney.   This designated share shall be in

6  addition to any amounts paid to the State under subparagraph (C), below.   The

7  State shall have sole discretion to determine the manner in which it will distribute

8  its remaining share of Sub-Fund B to California consumers, including criteria for

9  choosing which Borrowers shall receive any restitution and the amount to

10  distribute to each.

11      **C.    Payment to the Settling States.** Within three (3) business days after the Effective

12  Date, ACCCH or AMQ shall pay, by wire transfer or as otherwise directed by the Settling States,

13  the sum of Thirty Million Dollars ($30,000,000) to the Settling States for their attorneys' fees,

14  investigation costs, and other expenses related to the investigation and resolution of this matter.

15  The State of California's share of these settlement costs is Four Million Dollars ($4,000,000).

16  One Million Dollars ($1,000,000) of California's share of the settlement costs is to be paid by

17  ACCCH and the Ameriquest Parties in settlement of Plaintiff's claims related to California

18  Business and Professions Code section 17206 concerning Covered Transactions prior to

19  December 31, 2002, which shall be divided evenly among the Office of the Attorney General, the

20  Department of Corporations, and the District Attorney's Offices of Alameda, Los Angeles,

21  Merced, Monterey, San Francisco and San Mateo Counties.  ACCCH or AMQ shall distribute

22  the entire Four Million Dollars ($4,000,000) being paid to the State of California pursuant to this

23  subparagraph as follows:  One Million, Four Hundred Seventy-Five Thousand Dollars

24  ($1,475,000) to the Office of the California Attorney General, of which the Attorney General

25  shall transfer $425,000 to the District Attorney's Office of Monterey County and $425,000 to the

26  District Attorney's Office of San Mateo County; Six Hundred and Twenty-Five Thousand

27  Dollars ($625,000) each to the Department of Corporations and the District Attorney's Office of

28

1  Alameda County; and Four Hundred Twenty-Five Thousand Dollars ($425,000) each to the

2  District Attorney's Offices of Los Angeles, Merced, and San Francisco Counties.

3       **D.**    **Payment Schedule.**  All payments to the Settlement Fund shall be by wire

4  transfer to the Settlement Administrator and deposited by the Administrator into an interest

5  bearing account.  In the event the Settlement Administrator is not in place at the time any

6  payment is due, ACCCH or AMQ shall make the payment into an escrow account established for

7  that purpose by the Compliance Committee with a trustee to be named by the Settling States,

8  who shall deposit the payment with the Settlement Administrator as soon as one is in place.

9  ACCCH or AMQ shall make the required payments according to the following schedule:

10       **1.**    The sum of Forty-five Million Dollars ($45,000,000) shall be paid no later than

11            three (3) business days after the Effective Date.

12       **2.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than ninety

13            (90) days after the date the first payment is due.

14       **3.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than one

15            hundred eighty (180) days after the date the first payment is due.

16       **4.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than two

17            hundred seventy (270) days after the date the first payment is due.

18       **5.**    The sum of Seventy Million Dollars ($70,000,000) shall be paid not later than

19            three hundred sixty five (365) days after the date the first payment is due.

20       **E.**    **Funds to Be Held in Trust.**  All monies in the Settlement Fund, including

21  interest income, shall be held in trust for the purposes stated in this Judgment.  Neither ACCCH

22  nor the Ameriquest Parties shall have any property right, interest, claim or title to the Settlement

23  Fund or any interest earned thereon once a deposit is made into the Settlement Fund.

24       **F.**    **Qualified Settlement Fund.**  The fund established by this Judgment for the

25  payment of restitution is intended to be a Qualified Settlement Fund within the meaning of

26  Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.

27

28

## IV. INJUNCTIVE RELIEF

The Ameriquest Parties are enjoined with respect to their origination and funding of Loans from engaging in unfair or deceptive acts or practices and are further enjoined as follows:

**A.    Scope.**  The injunctive requirements set forth below are intended as a floor or minimum requirements governing the conduct of the Ameriquest Parties.  Nothing set forth herein alters the requirements of state or federal law to the extent those laws offer greater protection to consumers.

**B.    Disclosure of Loan Terms.**   The Ameriquest Parties shall not make false, misleading or deceptive representations regarding Loan terms and shall make the following disclosures to Potential Borrowers in a clear manner:

1.    **Oral Disclosures.**  Ameriquest Parties' Sales Personnel, whenever they have obtained Non-Prime Loan pricing information from their respective pricing model based on credit information provided by a Potential Borrower and that Potential Borrower has in a conversation with an Ameriquest Party Sales Person agreed to the submission of a specific Non-Prime Loan proposal for processing (but in no event later than when an appraisal or loan documents have been ordered, whichever occurs first), shall provide oral disclosures as follows:

a.    **Fixed Rate Mortgage - Specific Loan Terms.**  If the proposed Non-Prime Loan is a Fixed Rate Mortgage, the Ameriquest Parties' Sales Personnel shall provide an oral disclosure in substantially the following form:

"The loan we have been discussing is a [insert term of the loan] year fixed rate loan for $ [insert loan amount].  The interest rate is [insert interest rate]%.  The monthly payment is $[insert monthly payment], which does [or does not] include escrows for property taxes or insurance.  Your loan does [or does not] include a prepayment penalty."

b.    **Fixed Rate Mortgage - With Discount Points.**  If the proposed Non-Prime Loan includes a fixed rate mortgage and provides for the

1    payment of Discount Points, Ameriquest Parties' Sales Personnel shall

2    provide an oral disclosure in substantially the following form:

3        "This loan includes payment of [insert number] discount points, a

4    fee you pay at closing that reduces the interest rate on your loan and also

5    the amount of your monthly payment but increases the total amount of

6    your loan. You may be eligible for a loan with fewer discount points."

7    c.    **Adjustable Rate Mortgage - Specific Loan Terms.** If the proposed

8    Non-Prime Loan includes an Adjustable Rate Mortgage, Ameriquest

9    Parties' Sales Personnel shall provide an oral disclosure in substantially the

10    following form:

11        "The loan we have been discussing is an adjustable rate loan for

12    $[insert loan amount], with an initial interest rate of [insert initial interest

13    rate]%. Your initial monthly payment would be $[insert initial monthly

14    payment], which does [or does not] include escrows for property taxes or

15    insurance. Your loan does [or does not] include a prepayment penalty.

16        "Because this is an adjustable rate loan, the initial interest rate and

17    monthly payment I quoted you are only guaranteed for the first [insert

18    length of initial fixed rate period] of the loan. After that, your interest rate

19    can increase by up to [insert rate adjustment cap] percent each year. But,

20    your interest rate can never be higher than [insert lifetime cap] percentage

21    points over your initial interest rate."

22    If the Sales Person has not previously discussed a specific Fixed Rate

23    Mortgage proposal with the Potential Borrower, the Sales Person shall also

24    provide an additional oral statement in substantially the following form:

25        "You may be eligible for a loan with an interest rate that does not

26    change."

27    d.    **Adjustable Rate Mortgage - With Discount Points.** If the proposed

28    Non-Prime Loan includes an Adjustable Rate Mortgage and the payment

of Discount Points, Ameriquest Sales Personnel shall provide an oral

disclosure in substantially the following form:

 "This loan includes a payment of [insert the number] discount

points, a $[insert the amount of the discount points in dollars] fee you will

pay at closing to lower your initial interest rate and monthly payment.

You may be eligible to pay fewer discount points, but if you do that your

initial interest rate and monthly payment will be higher."

 **e.** **Prepayment Penalty.**  If the proposed Non-Prime Loan includes a

Prepayment Penalty, Ameriquest Sales Personnel shall make an oral

disclosure in substantially the following form:

 "This loan contains a prepayment penalty.  That means if you pay

off or refinance your loan within [insert the length of the period] you will

pay a fee of as much as $[insert the amount of the fee in dollars].  You

may be eligible for a loan without a prepayment penalty, but you would

then pay a higher interest rate and a higher monthly payment."

 **f.** **Concluding Statement.**  The Ameriquest Parties' Sales Personnel shall

conclude the conversation with the Potential Borrower by making a

statement in substantially the following form:

 "We will be sending you some written disclosures that explain

your options regarding a fixed versus adjustable rate loan, paying more or

less discount points and a loan with or without a prepayment penalty.  If,

after reading the information we send you, you wish to make any changes

to this loan proposal, please give me a call."

 **g.** **Interest Rate Disclosure.**  The Ameriquest Parties shall disclose the

interest rate being offered, if known, whenever asked by a Potential

Borrower.

 **h.** **Written or Electronic Disclosures.**  The Ameriquest Parties' Sales

Personnel shall be instructed that in the event a Potential Borrower's

1    application is not submitted orally but in a written or electronic document

2    (or submitted through a website or other electronic format), the foregoing

3    oral disclosures, as and if applicable, shall be provided within three (3)

4    days of receipt of the application, in writing by mail or by transmission by

5    the same means used in submitting the application.

6        i.    **Failure to Make Oral Disclosures.**  If an Ameriquest Party discovers that

7    a Sales Person has failed to make required oral disclosures to the Potential

8    Borrower, that Ameriquest Party shall take prompt and appropriate

9    disciplinary action, up to and including dismissal of the responsible

10    personnel.

11        2.    **Written Disclosures.**  Within three (3) days after obtaining Loan pricing

12    information from their respective pricing model based on credit information

13    provided by a Potential Borrower and the Potential Borrower agreeing to the

14    submission of a specific Loan proposal for processing (but in no event later than

15    three (3) days after when an appraisal or loan documents have been ordered,

16    whichever occurs first) and without regard to any other disclosure requirements,

17    the Ameriquest Parties shall provide the Potential Borrower a single page

18    disclosure, in writing or electronically, which discloses the terms of the specific

19    Loan proposal being offered to the Potential Borrower, in substantially the form as

20    attached hereto as Exhibit A (hereafter "Disclosure Form").  The initial Disclosure

21    Form may be included with other required disclosures being sent to Potential

22    Borrowers at the same time.

23        a.    If any one or more Material Changes in Terms occurs, subsequently

24    making the initial Disclosure Form inaccurate, the Ameriquest Parties

25    shall mail, not less than six (6) days before Closing, or deliver or cause to

26    be delivered by courier, facsimile transmission, e-mail or website access

27    so as to be received or accessed by the Potential Borrower at least three (3)

28    days prior to Closing for a Non-Prime Refinance Loan and as soon as

1    reasonably possible but in no event less than one (1) day prior to Closing

2    for any other Loan, a revised Disclosure Form that reflects the Loan terms

3    that will be presented to the Potential Borrower at Closing, including all

4    Material Changes in Terms.

5       **b.**   Notwithstanding the provisions of Section IV.B.2.a. above, an Ameriquest

6    Party need not provide the Potential Borrower a revised Disclosure Form

7    when the only Material Change in Terms is an increase in Discount Points

8    of no more than forty-seven (47) basis points and that increase has been

9    requested by the Potential Borrower to buy down an increase in the interest

10    rate that would not by itself represent a Material Change in Terms.

11       **c.**   If the revised Disclosure Form is mailed or delivered by courier or

12    facsimile transmission, it must be accompanied by a cover letter advising

13    the Potential Borrower that changes have been made to the terms of the

14    proposed Loan.  If the revised Disclosure Form is delivered by e-mail

15    message, the subject line must contain the following: "IMPORTANT

16    CHANGES to your [THE APPLICABLE AMERIQUEST PARTY] loan

17    proposal."  If the revised Disclosure Form is delivered by website access,

18    access to the website must be password protected.

19       **d.**   Compliance with the time provisions of this subparagraph may be proven

20    by satisfactory proof of one of the following:

21          (1)   Timely mailing;

22          (2)   Timely dispatch by courier or facsimile transmission;

23          (3)   Confirmation of timely receipt of the e-mail by the Potential

24             Borrower; or

25          (4)   Confirmation of timely access to the web site by the Potential

26             Borrower.

27       **e.**   The Ameriquest Parties shall instruct the Independent Loan Closer that the

28    final Disclosure Form must be the first document presented to the

1    Potential Borrower at Closing by the Independent Loan Closer, who shall

2    review it with, and have it signed by, the Borrower.  In the event an

3    Ameriquest Party employee is conducting the Closing, when permitted

4    under this Judgment, the final Disclosure Form shall be the first document

5    presented to the Potential Borrower at Closing, who shall review it with,

6    and have it signed by, the Borrower.

7    **3.**    In communicating with Potential Borrowers, the Ameriquest Parties shall not

8    represent that their respective interest rate or terms are "better," "lower" than, or

9    "competitive" with those of other mortgage lenders, or use words of similar

10    import, unless such representations are in fact true.

11    **4.**    The Ameriquest Parties shall not misrepresent the adjustable rate feature of any

12    Adjustable Rate Mortgage.  For example, the Ameriquest Parties may not:

13    **a.**    State or imply that the interest rate on the Loan will not, or is unlikely to,

14    adjust in the future;

15    **b.**    State or imply that the interest rate on the Loan can go down (from its

16    initial rate) as well as up, unless that is in fact true;

17    **c.**    State or imply that the initial "fixed" interest rate in an Adjustable Rate

18    Mortgage is the interest rate for the entire term of the Loan;

19    **d.**    State or imply that the interest rate will go up only if the market rates

20    increase, unless that is, in fact, true.

21    **5.**    When comparing different Loans, the Ameriquest Parties shall not state or imply

22    that monthly Loan payments, which include amounts escrowed for payment of

23    property taxes and homeowner's insurance, are comparable with monthly Loan

24    payments that do not include these amounts.  The Ameriquest Parties shall inform

25    a Potential Borrower whether the monthly payment discussed with or proposed to

26    the Potential Borrower does or does not include any amount escrowed for taxes or

27    insurance, as the case may be.

28

17
PERMANENT INJUNCTION AND FINAL JUDGMENT

6.    No Ameriquest Party shall represent to a Potential Borrower that it will be able to Refinance the Potential Borrower's proposed Loan at a later date on more favorable terms unless the Loan proposal being made to the Potential Borrower provides that the Ameriquest Party is contractually bound to Refinance the Potential Borrower's proposed Loan at the later date on more favorable terms.

7.    The Ameriquest Parties shall not misrepresent to any Borrower or Potential Borrower the credit rating or credit status of that Borrower or Potential Borrower.

C.    **Same Rate Available.**  The Ameriquest Parties shall make Loans in accordance with a pricing model that is designed to produce (before the use of any price exception) the same interest rate and number of Discount Points for all Potential Borrowers with the same credit risk characteristics, who are applying for the same Loan, and who are the same with respect to any other characteristic(s) or fact(s) that affect the pricing information generated by the pricing model.  Nothing herein shall prohibit an Ameriquest Party from making individual "price exceptions" wherein the Ameriquest Party offers a Potential Borrower a rate that is lower than the rate for which the Potential Borrower otherwise qualifies ("Price Exception").  Provided, however, if in any ninety (90) day period the number of Borrowers receiving a Price Exception from an Ameriquest Party exceeds thirty percent (30%) of the Loans originated within the period, there shall be a rebuttable presumption that the Ameriquest Party has violated the provisions of this Section IV.C.

Price Exception does not include the following: (1) a price reduction given to prevent the Loan from becoming a high-cost or covered loan under the Home Ownership and Equity Protection Act (HOEPA), or any similar state law, or from violating any state law limitation on fees, rates, or other costs; (2) a price override given at or near the time of funding to honor a previous price commitment; or (3) a firm offer of credit to a pre-screened Potential Borrower that is required by the Fair Credit Reporting Act and based upon the pricing model price at the time of the offer but that is not accepted by the Potential Borrower until after the pricing model price has increased.

**D.    Good Faith Estimates (GFE).**  The Ameriquest Parties shall provide each Loan applicant with a GFE, as required by RESPA.  The Ameriquest Parties shall not disparage, discredit, or otherwise encourage Potential Borrowers to disregard the GFE.  For example, the Ameriquest Parties shall not represent to a Potential Borrower that the GFE is incorrect, reflects the worst case scenario, is not the true Loan proposal, or reflects terms that are higher or lower than the actual terms the Potential Borrower will receive.

**E.    Borrower Benefit Assessment.**  The Ameriquest Parties shall not enter into any Non-Prime Refinance Loan that does not provide a benefit to the Borrower.  The Ameriquest Parties must document that each Non-Prime Refinance Loan provides a benefit and maintain such documentation in a readily retrievable format.

**F.    Foreign Language Provisions.**  The Ameriquest Parties shall continue their current policy of: (a) maintaining a program of testing and certifying appropriate Sales Personnel for fluency in the Spanish language, and (b) translating into Spanish (i) all documents legally required to be translated, (ii) the Disclosure Form and (iii) any other disclosure documents voluntarily provided to Potential Borrowers under an Ameriquest Party's Best Practices.  If an Ameriquest Party advertises in any language other than English or Spanish, it must adopt and implement a similar policy with respect to consumers who speak the other language.

**G.    Prepayment Penalties.**

**1.**    The Ameriquest Parties shall reimburse a consumer for any Prepayment Penalty paid by that consumer if the existence of the penalty was not timely and fully disclosed.  The Ameriquest Parties shall be deemed to have complied with this requirement of full and timely disclosure by the mailing or delivery of the Disclosure Form as provided in Paragraph IV.B.2 above.

**2.**    For any Non-Prime Adjustable Rate Mortgage Loan originated one (1) year or later after the Effective Date that has a Prepayment Penalty, the term of the Prepayment Penalty may not exceed six months beyond the fixed rate term of the Loan.  For a period of five (5) years after the Effective Date, the Ameriquest

Parties shall, with respect to such Loans, limit the interest rate adjustment during the Prepayment Penalty term to not more than two (2) percentage points.

3. The Ameriquest Parties shall not make false, misleading or deceptive representations regarding a Prepayment Penalty provision. For example:

    a. Whenever an Ameriquest Party orally represents that a Potential Borrower can Refinance at a later date, that Ameriquest Party must also simultaneously advise the Potential Borrower of any obligation to pay a Prepayment Penalty.

    b. The Ameriquest Parties shall not promise or represent to a Potential Borrower that the Ameriquest Parties will waive a Prepayment Penalty at some future date, unless that promise is contemporaneously communicated in writing and is included as a term in the Loan made to the Potential Borrower.

    c. The Ameriquest Parties shall not refer to a Prepayment Penalty as a "Prepayment Privilege," a "Prepayment Benefit," a "Prepayment Opportunity," or use any similar term that tends to mislead a Potential Borrower regarding the obligation to pay a penalty.

    d. The Ameriquest Parties shall not state, infer or imply that the circumstances that would trigger a Prepayment Penalty may not or will not occur; provided, however, that the Ameriquest Parties may inform a Potential Borrower of the facts regarding when a Prepayment Penalty included in a Loan proposal does and does not have to be paid according to its terms.

4. The Ameriquest Parties shall continue their current practice of not providing their employees with any monetary incentive or other compensation for including a Prepayment Penalty provision in a Loan.

**H.    Repeat Refinancings.**

1.    No Ameriquest Party may solicit Borrowers with existing Non-Prime Loans for Refinancing within twenty-four (24) months of the Loan Closing date unless it:

    a.    Receives a request for a pay-off statement from the Borrower or by someone authorized by the Borrower;

    b.    Is contacted by a Borrower who expressly inquires about Refinancing; or

    c.    Otherwise has a good faith belief, supported by objective evidence, that the Borrower is considering Refinancing.

2.    Any proposed Refinancing of a Borrower's Non-Prime Refinance Loan must provide a benefit pursuant to Section IV.E above.

3.    No Ameriquest Party employee may offer, give or receive compensation to or from a fellow employee, including employees of the Portfolio Retention Centers, in connection with Refinancing a Borrower within twenty-four (24) months of the Closing date of an existing Loan; provided, however, this restriction shall not apply to payments made under an Ameriquest Party's then existing compensation policy.

**I.    Independent Loan Closers.**

1.    The Ameriquest Parties shall use an Independent Loan Closer for all of their Non-Prime Loan Closings.

2.    Written Instructions and Whistleblower Agreement.  The Ameriquest Parties shall provide each Independent Loan Closer with written instructions and procedures, which the Independent Loan Closer shall be required to follow at Closings.  The Ameriquest Parties shall require the Independent Loan Closer to provide a written report both to designated Ameriquest Party senior management, and to the Monitor during the compliance monitoring period, if the Independent Loan Closer discovers unfair, deceptive, misleading or unlawful behavior by any Ameriquest Party employee in connection with any Loan.  If an Ameriquest Party learns that an Independent Loan Closer failed to report such misconduct, the Ameriquest

1    Party shall take disciplinary action against the Independent Loan Closer, including

2    temporary or permanent removal from the list of approved Independent Loan

3    Closers.  The Ameriquest Parties may not retaliate against an Independent Loan

4    Closer for reporting misconduct.

5    3.    Independent Loan Closers shall be instructed by the Ameriquest Parties to explain

6    fully the Closing process and Loan documents to Potential Borrowers and to

7    answer all questions from Potential Borrowers to the best of the Independent Loan

8    Closer's ability, unless the Independent Loan Closer is prohibited by law or

9    professional standards from doing so.  Further, Independent Loan Closers shall be

10   instructed not to pressure or rush Potential Borrowers at Closing or encourage

11   them to close by suggesting Potential Borrowers may use the rescission period

12   either to read Loan documents or to address questions or objections raised at

13   Closing.

14   4.    Employees of Ameriquest Parties may attend Non-Prime Loan Closings only if

15   requested by a Potential Borrower.  Ameriquest Party employees attending a

16   Closing may not pressure or rush Potential Borrowers, encourage them to close by

17   suggesting they may use the rescission period either to read Loan documents or to

18   address questions or objections raised at Closing, or in any way obstruct the

19   ability of the Independent Loan Closer to perform his or her duties.  The

20   Independent Loan Closer shall be required to report any violation of this

21   Paragraph IV.I.4 by any Sales Personnel to designated persons in the appropriate

22   regional or headquarters office of the applicable Ameriquest Party.  Persons

23   designated may not be Sales Personnel.

24   5.    Notwithstanding the foregoing, Ameriquest employees may conduct and attend

25   Closings of Loans that are not Non-Prime Loans.

26   **J.    Closings.**

27   1.    Before Closing a Loan, the Ameriquest Parties shall ensure that (a) the Potential

28   Borrower has satisfied all credit Underwriting requirements; (b) an Appraisal or

1    AVM has been submitted and evaluated (if required); and, (c) standard

2    title-related information has been received and reviewed.

3    **2.**    The Ameriquest Parties may Close a Loan subject to satisfaction of standard

4    industry contingencies such as execution and receipt of state-specific documents

5    (e.g., New York and New Jersey same-name affidavits, Texas election not to

6    rescind forms, receipt of pay stubs for proof of employment, credit report

7    explanation letters, use of proceeds letters and hazard insurance loss payee

8    endorsements).

9    **3.**    If an Ameriquest Party schedules a Closing before satisfying the requirements set

10    forth above in Paragraph IV.J.1, it may not represent, suggest or imply to a

11    Potential Borrower that a Loan has been or will be approved, unless and until

12    these Closing requirements are met.  If an Ameriquest Party communicates with a

13    Potential Borrower to schedule a Closing before the Closing requirements have

14    been met, it must clearly inform the Potential Borrower that the Loan has not yet

15    been approved, and that Closing is contingent upon resolution of all outstanding

16    issues.

17    **K.**    **Loan Funding.**  The Ameriquest Parties must fully and unconditionally disburse

18    the proceeds of all Refinance Loans to the Borrower, settlement agent, or other creditors as

19    reflected in the settlement statement on the first business day after the expiration of any

20    rescission period provided for by law or internal Best Practices; provided, however, that the

21    Ameriquest Parties will not be deemed to have violated this requirement where: (1) Closing

22    contingencies as set forth in Paragraph IV.J.2 have not been satisfied; (2) an Ameriquest Party is

23    prevented from fully disbursing the proceeds because the wire transfer is delayed (by no more

24    than one (1) day) due to the volume of other scheduled Closings; or (3) by other causes beyond

25    an Ameriquest Party's reasonable control and occurring without its fault or negligence, including,

26    Acts of God, floods, fires, government restrictions, wars, strikes and insurrections.

27    If an Ameriquest Party fails, for reasons other than those described above, to timely

28    disburse the Refinance Loan proceeds, it shall reimburse any resulting interest, late fees, or other

1    charges incurred by the Borrower, and fully cooperate in assisting the Borrower in removing any

2    adverse credit report information arising from the non-timely payment.  Notwithstanding the

3    foregoing, no Ameriquest Party shall be required to disburse the proceeds of any Loan until it is

4    reasonably satisfied the Borrower has not rescinded the Loan transaction.

5         **L.**    **Appraisals.**

6         **1.**    **Conducting Appraisals.**  The Ameriquest Parties shall take reasonable steps to

7        ensure all Appraisals are accurate, that appraisers do not inflate property values

8        and that no employee of an Ameriquest Party attempts to influence the

9        development, reporting, result or review of any Appraisal or otherwise interferes

10       with an appraiser's professional duty to perform the Appraisal impartially,

11       objectively and independently.

12        **2.**    **Removal of Branch from Appraiser Selection.**  The Ameriquest Parties shall

13       implement a system to ensure that Appraisals are ordered as part of an automated,

14       centralized process apart from the branch sales offices.  Sales Personnel may not

15       select appraisers.

16       The Ameriquest Parties shall inform all appraisers currently on their

17       approved or accepted lists that they are no longer dependent upon the branch

18       offices for Appraisal assignments, that only the Appraisal Department can remove

19       them from a panel, and that they are to ignore, and report immediately to the

20       Appraisal Department, any effort by any Sales Person, including any Mortgage

21       Specialist, Branch Manager, Area Sales Manager, or Regional Sales Manager to

22       influence appraised value in any way.

23       Similarly, the Ameriquest Parties shall instruct Sales Personnel they are

24       not to engage in any communications with any appraiser regarding the substantive

25       content of the Appraisal report or the final appraised value, or to attempt to

26       influence the results of the Appraisal in any way and, if they are found to have

27       done so, they will be subject to immediate disciplinary action, up to and including

28       dismissal.

3. **Automated Selection of Ranked Appraisers Required.** A panel of qualified, approved appraisers shall be created for each State. When a new Loan file is opened, the automated system will assign the Appraisal to an appraiser on the appropriate panel using an algorithmic system designed to limit choice or selection from the discretion of Ameriquest Party employees. This algorithmic system shall be created and maintained by the Appraisal Department and may involve ranking appraisers on the basis of legitimate and relevant factors, including:

    a.     The appraiser's familiarity with the geographic locale of the subject property and the type of property to be appraised;

    b.     The number of Appraisals the appraiser is capable of performing within a given time period;

    c.     The appraiser's record with respect to responsiveness and timeliness;

    d.     The status of the appraiser's license; and

    e.     Whether, at the time of the Appraisal request, the appraiser has prior Appraisals undergoing pre- or post-funding review or investor due diligence review.

In limited cases (but in no event for purposes of a second or subsequent Appraisal), the Appraisal Department may assign Appraisals to appraisers not selected using the algorithmic system, if the consideration of previously unconsidered legitimate and relevant factors dictates. In that event, the Appraisal Department shall document the reasons for its departure from the normal selection process and maintain the documentation in a readily retrievable format. In no event, however, shall the willingness or unwillingness of an appraiser to produce a desired value become a factor in the selection of an appraiser.

4. **Appraiser Panels.**

    a.     **Service Areas.** If an appraiser declines an assignment because the appraiser, in his or her professional judgment, believes the property is

1   outside of the appraiser's professional service area, the Appraisal

2   Department shall assign the Appraisal to another appraiser and may not

3   pressure the declining appraiser to accept the assignment.  The Ameriquest

4   Parties shall not punish appraisers, including by reducing future

5   assignments, for declining assignments the appraiser believes are outside

6   the appraiser's professional service area.

7   **b.**    **Inclusion on a Panel.**  As a prerequisite to inclusion on a panel, an

8   appraiser must be in good standing with his or her licensing authority.

9   Only persons who are not Sales Personnel may oversee the selection of

10  appraisers on the panel.

11  **(1)**    Before being assigned to a panel, all appraisers who currently or in

12  the past have performed Appraisals on behalf of an Ameriquest

13  Party, including staff appraisers, must have their work product

14  audited for quality and compliance by the Appraisal Department or

15  by a licensed third party appraiser retained for auditing purposes.

16  The Ameriquest Parties agree to review or have reviewed, for each

17  of these appraisers, the greater of ten (10) Appraisals or fifteen

18  percent (15%) of the total number of Appraisals performed by the

19  appraiser for Refinance Loans submitted for approval during the

20  six months prior to the review.  If the total number of Appraisals

21  performed by an appraiser during that period is less than ten (10),

22  then all Appraisals performed by that appraiser during that period

23  shall be reviewed.  Whenever possible, Appraisals shall be selected

24  for review from the pool of Appraisals performed by the appraiser

25  on Refinance Loans submitted for approval and previously subject

26  to investor due diligence or pre- or post-funding reviews during the

27  period.  To the extent the number of previously reviewed

28  Appraisals is insufficient for this purpose, additional Appraisals

1    shall be selected at random from the remaining previously

2    unreviewed Appraisals in the pool.  If the result of this review

3    indicates further evaluation is necessary, the Appraisal Department

4    (or Third Party Reviewer) shall conduct an additional audit of a

5    random sample of fifteen percent (15%) of Appraisals drawn from

6    those performed by the appraiser for Refinance Loans submitted

7    for approval during the year prior to this review.  Any Ameriquest

8    Party may use an appraiser who has been placed on a panel by

9    another Ameriquest Party.  No Ameriquest Party may use an

10    appraiser who fails an audit review by any Ameriquest Party.

11    (2)    Appraisers who have been previously disciplined by their licensing

12    authority are not eligible for inclusion on a panel.  The foregoing

13    provision shall not apply where the discipline is for reasons not

14    involving dishonesty or appraisal quality.  In the unlikely event that

15    a sufficient number of non-disciplined appraisers are not available

16    to serve a particular defined service area, an Ameriquest Party may

17    use an appraiser who has been disciplined previously by his or her

18    licensing authority but only if the discipline did not involve

19    allegations of fraud or misrepresentation, the license was not

20    suspended and the last disciplinary action was at least one year

21    prior to the proposed retention date.

22    **5.**    **Appraiser Independence.**  The Ameriquest Parties shall comply with the

23    independence standards set forth in the October 28, 2003, Independent Appraisal

24    and Evaluation Functions statement by the Office of the Comptroller of the

25    Currency, Federal Reserve Board of Governors, Federal Deposit Insurance

26    Corporation, Office of Thrift Supervision and National Credit Union Association,

27    as amended from time to time.

28

6. **Communication of Expected Value to Appraiser Prohibited.**

    **a.**    There shall be no direct communication between Branch Managers or Mortgage Specialists and appraisers except for communications initiated by the appraiser in response to which the Manager or Specialist shall immediately refer the appraiser to the appropriate persons in the Appraisal Department.

    **b.**    In the case of Refinance Loans, no Ameriquest Party employee may identify on the Appraisal order form or communicate by any other means to any individual appraiser or firm either the Loan amount or any other express or implied statement of the anticipated or desired Appraisal value. However, the Borrower's estimated value of the property may be identified on the Appraisal order form but only if accompanied by a statement it is being provided solely to assist the appraiser in determining the relative complexity of the Appraisal and that it is not a target or expected value.

7. **Appraisal Review.** At the same time the completed Appraisal report is delivered (by whatever means) to the Appraisal Department, the report may be forwarded or otherwise made available to the applicable Branch Manager.

    **a.**    If, for the initial Appraisal only, the Branch Manager has a good faith belief that the Appraisal contains an error or is otherwise professionally deficient, the Branch Manager may submit a written or electronically transmitted request to the Appraisal Department explaining the objection and requesting the appraiser address the specific issue raised. If the Appraisal Department agrees that a good faith basis for the review exists, either on the basis of a request from the Branch Manager or on the basis of a pre-funding review, the Appraisal Department may request in writing or by electronic transmittal the appraiser do one or more of the following:

        **(1)**    Consider additional appropriate information about the property, including additional comparables;

(2)   Provide further detail, substantiation, or explanation for the appraiser's valuation; or

(3)   Correct errors in the Appraisal. The Appraisal Department may not request that an appraiser review an Appraisal solely on the grounds that the valuation is not high enough to qualify the Potential Borrower for the proposed Loan and shall not suggest a specific value.

b.   The Ameriquest Parties shall document and retain in a readily retrievable format any change in the Appraisal and the reason for the change.

8.   **Second Appraisals.** If, after the review process set forth in Paragraph IV.L.7 above has been completed, the Ameriquest Party continues to believe the Appraisal is professionally deficient, that Ameriquest Party may order a second Appraisal from the next appraiser on the panel. The Ameriquest Parties may not order a second Appraisal prior to the completion of this review process; provided, however, that nothing contained herein shall prevent an Ameriquest Party from ordering two simultaneous Appraisals where a particular Loan program requires two different Appraisals. The Ameriquest Parties may also order a second Appraisal in the following cases: (a) where the appraised value of the property is within ten percent (10%) of the value necessary to make the proposed Loan, (b) where the Ameriquest Party reasonably believes the property has been damaged or has otherwise declined in value since the first Appraisal, or (c) where the Appraisal has expired before the Loan has been closed. The Ameriquest Parties shall pay the cost of any second Appraisal ordered because the appraised value was within ten percent (10%) of the value necessary to make the proposed Loan. In no event shall the Ameriquest Parties order more than two Appraisals.

9.   **Appraisal Audits.** Each Ameriquest Party shall maintain a record of its Appraisal review and second Appraisal requests, retrievable by branch office, mortgage specialist and by appraiser. This record shall contain the value

29
PERMANENT INJUNCTION AND FINAL JUDGMENT

1    determined by each Appraisal and the amount of any change in value resulting

2    from the review or second Appraisal.  The Ameriquest Parties shall audit an

3    appraiser's work whenever the Appraisal Department requests review of more

4    than a certain percentage of Appraisals performed by the appraiser for Refinance

5    Loans submitted for approval during a twelve (12) month period.  For those

6    appraisers with less than ten (10) Appraisals performed during a twelve (12)

7    month period, the Ameriquest Parties shall review the appraiser's work only if the

8    Appraisal Department made two or more review requests during the period.

9    An Ameriquest Party shall conduct a comprehensive review of its

10    Appraisal review process whenever the number of review requests or the number

11    of second Appraisals by the Ameriquest Party submitted during a twelve (12)

12    month period exceeds a certain percentage of the total of all first Appraisals

13    during the same period.  The exact percentages to be used to determine whether an

14    Appraisal audit is required will be established by agreement between the

15    Ameriquest Parties and the Compliance Committee no later than twelve (12)

16    months after the Effective Date.

17    **10.    Discipline/Mandatory Reporting.**  If an Ameriquest Party has a reasonable basis

18    to believe an appraiser is violating applicable laws, or is otherwise engaging in

19    unethical or unprofessional conduct, that Ameriquest Party shall refer the matter

20    to the applicable state appraiser regulatory agency, if any.  Similarly, if an

21    Ameriquest Party learns that one of its employees or agents involved in the Loan

22    production process has attempted to influence the Appraisal valuation process in

23    any manner, it shall immediately discipline the offending person, up to and

24    including dismissal.

25    **11.    Appraisal Monitoring.**  The Appraisal Department shall review twenty percent

26    (20%) of all Appraisals for Refinance Loans submitted for approval (which

27    review may be pre- or post-funding) as part of its existing internal quality control

28    procedures.  Review appraisers must be independent of Loan sales and shall be

1    assigned to review Appraisals from no more than ten (10) specific states within

2    the same geographic region.

3    **12.    Copies of Appraisals to Borrowers.**  A complete copy of the Appraisal (or the

4    AVM report if that was used for determining the value of the property) must be

5    provided to the Borrower.  If more than one Appraisal (or AVM report) is

6    completed, copies of all Appraisals (or AVM reports) must be provided to the

7    Borrower.

8    **13.    Appraiser Compensation.**  Appraisers must be timely paid for every completed

9    Appraisal regardless of whether the Loan actually closes.  The Ameriquest Parties

10    shall not pay additional or bonus compensation to an appraiser for meeting the

11    desired Appraisal value and no Ameriquest Party employee may accept

12    compensation of any kind from an appraiser or Appraisal firm for an Appraisal

13    assignment.

14    **M.    Stated Income Loans.**

15    1.    The Ameriquest Parties shall not:

16    a.    Inflate or fabricate, or encourage a Potential Borrower to inflate or

17    fabricate the source or amount of a Potential Borrower's actual income or

18    assets; or

19    b.    Sign any document on behalf of a Borrower.

20    2.    The Ameriquest Parties shall instruct the Independent Loan Closer to review with

21    the Potential Borrower, and require the Potential Borrower to sign, at and as a

22    condition of Closing, a statement certifying the Potential Borrower understands

23    that:

24    a.    The Loan has been approved based on the amount of income reported by

25    the Potential Borrower;

26    b.    The amount of income reported by the Potential Borrower is accurate;

27    c.    If the Potential Borrower's income is in fact less than the amount set forth

28    in the Loan application, the Potential Borrower understands there is a

1  significant risk that the Potential Borrower will not be able to afford the

2  Loan and may lose their home through foreclosure or be forced into

3  bankruptcy; and

4  **d.**  Any false statements may subject the Potential Borrower to criminal

5  penalties.

6  **3.**  The Ameriquest Parties shall maintain a record of those applications that are

7  originally submitted as full document or limited document (also called Fast Trac)

8  Loans that are subsequently approved as Stated Income Loans.

9  **4.**  The Underwriting guidelines employed by the Ameriquest Parties shall require the

10  amount of stated income be reasonable for the occupation and experience claimed.

11  **5.**  If a Stated Income Loan is based upon self-employment or a home-based business,

12  the Ameriquest Parties shall request evidence of the existence of the business.

13  **N.**  **Employee Compensation Programs.**  The compensation system employed by an

14  Ameriquest Party may not provide incentives that encourage its employees: (1) to include a

15  Prepayment Penalty provision in a Loan, (2) to quote a Potential Borrower an interest rate

16  inconsistent with the Same Rate Available provision of this Judgment, or (3) to otherwise

17  increase compensation based on Loan fees or Closing costs.

18  **O.**  **Quotas.**  The Ameriquest Parties may not require its employees to complete an

19  unreasonable minimum number of Loan applications or Loan Closings per month or other time

20  period where the result is that employees violate any provision of this Judgment or the law.  No

21  branch, regional or area sales manager may establish a quota system separate from that

22  established by an Ameriquest Party; provided, however, nothing in this Judgment shall prohibit

23  regional, area or branch managers from conducting reasonable sales or incentive contests.

24  **P.**  **Whistleblower Policies and Procedures.**  The Ameriquest Parties shall adopt

25  written policies and procedures to facilitate reporting of suspected improper conduct by

26  Ameriquest Party employees.  Each Ameriquest Party shall provide a copy of these policies and

27  procedures, including the name, address and telephone number of a manager designated by that

28  Ameriquest Party to receive reports of suspected improper conduct, to all current employees and

1    all newly hired employees at the time of their employment.  These policies and procedures shall

2    include provisions to:

3        **1.**    Encourage the reporting of suspected improper conduct;

4        **2.**    Take reasonable steps to preserve the anonymity of the whistleblower to

5        the maximum extent practical;

6        **3.**    Investigate the allegations of suspected improper conduct and report the

7        results of that investigation to senior management; and

8        **4.**    Protect the whistleblower from retaliation.

9    **Q.**    **Employee Training.**

10    **1.**    Ameriquest Party branch employees shall complete a training course appropriate

11        to the duties and responsibilities of each employee, which shall include:

12        **a.**    A discussion of the Ameriquest Party's obligations under this Judgment

13        and a written summary of the Judgment provided to each trainee;

14        **b.**    A discussion of the purpose and general prohibitions of state unfair or

15        deceptive acts or practices statutes as they relate to secured real estate

16        mortgage lending.

17    **2.**    Newly hired Sales Personnel shall complete a training course which shall include,

18        in addition to the elements described above, basic training in mortgage lending

19        and in ethical sales practices.

20    **3.**    The General Counsel of ACCCH shall discuss with each of ACCCH's and the

21        Ameriquest Parties' officers and directors their respective general duties and

22        responsibilities as they relate to the real estate secured mortgage lending activities

23        of ACCCH or the Ameriquest Party with which they are associated and provide

24        each of them with a written summary of this Judgment.

25    **4.**    Each employee required to complete the training courses referred to in Paragraphs

26        IV.Q.1-2 above, and each officer and director of ACCCH and each Ameriquest

27        Party shall execute a form, which shall be maintained in a readily retrievable

28        format by ACCCH or the applicable Ameriquest Party, acknowledging:

1       **a.**     Completion of the training or discussion with the ACCCH Counsel, as the

2              case may be;

3       **b.**     They have received, read and understand the Ameriquest Party's

4              obligations under this Judgment as set forth in the above-referenced

5              written summary;

6       **c.**     They understand that violations of applicable state and federal laws may

7              subject them to individual liability and judicial or administrative sanction;

8              and

9       **d.**     They understand that violations of applicable state and federal laws may

10       subject the Ameriquest Party to liability and judicial or administrative

11       sanction.

12    **R.**     **No Coordination with Debt Collectors.** Neither the Ameriquest Parties nor its

13 employees may compensate Debt Collectors for providing referrals nor may the Ameriquest

14 Parties or its employees work in concert with Debt Collectors to pressure a Potential Borrower to

15 obtain a Loan from an Ameriquest Party. Nothing in this Section IV.R shall prohibit the

16 Ameriquest Parties from purchasing bulk mailing lists from Debt Collectors or receiving

17 uncompensated referrals from Debt Collectors, whether or not solicited.

18    **S. Other Provisions.**

19    **1.**      The Ameriquest Parties shall, for loans being made under the license issued to any

20       of them pursuant to the California Finance Lenders Law ("CFLL," as codified at

21       sections 22100 et seq. of the California Financial Code), refund appraisal fees to

22       Potential Borrowers in instances where (i) the loan was denied and there was no

23       failure on the part of the Potential Borrower to disclose outstanding liens and/or to

24       provide other essential information, and/or (ii) Potential Borrowers canceled their

25       loan during the cancellation period provided for under TILA.

26    **2.**      The Ameriquest Parties shall not, for loans being made pursuant to licenses issued

27       under the CFLL, charge Borrowers fees for returned and/or dishonored checks,

28

1    negotiable orders of withdrawal and/or share drafts in excess of the amount

2    provided for in section 22320 of the California Financial Code.

3    **3.**    The Ameriquest Parties shall maintain records as required by section 22156 of the

4    California Financial Code and the California Code of Regulations, title 10,

5    sections 1425 and 1435.

6    **V. ADMINISTRATION**

7    **A.**    **State Settlement Administration and Compliance Committee.**  Within fifteen

8    (15) days of the Effective Date, the Settling States shall designate a State Administration and

9    Compliance Committee (the "Compliance Committee").  The Compliance Committee shall serve

10    as the Settling States' representative in the administration of this Judgment and the monitoring of

11    compliance with it by ACCCH and the Ameriquest Parties.

12    **B.**    **Claims Process.**  Subject to the provisions of this Judgment pertaining to

13    Sub-Fund A, each Settling State shall determine the procedures to provide notice and distribute

14    restitution to its eligible Borrowers.

15    **C.**    **Procedures for Administration.**

16    **1.**    Within ninety (90) days of the Effective Date, the Ameriquest Parties, in

17    consultation with the Compliance Committee, shall choose and retain an

18    Administrator ("the Administrator") to administer the distribution of restitution

19    payments under this Judgment.  The Administrator shall be deemed appointed and

20    the contract approved unless within fifteen (15) days of receipt of the proposed

21    contract identifying the proposed Administrator, more than one-third (1/3) of the

22    number of the Settling States object to the appointment.

23    **2.**    Subject to the limitations of Section IV above, each Settling State shall determine

24    the criteria, procedures and manner of allocation and distribution of restitution to

25    the eligible Borrowers in that State and may direct the Administrator with respect

26    to these matters.

27    **3.**    ACCCH or the Ameriquest Parties shall pay to the Settlement Fund an amount

28    sufficient to pay the Administrator's reasonable fees and expenses, including

1  attorneys' fees and costs of litigation, if any, related to maintaining the

2  confidentiality of customer and proprietary information; provided, however, that

3  in no event shall the total of fees, expenses and costs of administration exceed

4  Seven Million Five Hundred Thousand Dollars ($7,500,000).  From time to time,

5  as the Settlement Fund incurs administrative costs, it shall render an invoice of the

6  reasonable costs incurred to ACCCH or the Ameriquest Parties and ACCCH or

7  the Ameriquest Parties shall, within thirty (30) days of receipt, transfer that

8  amount to the Settlement Fund for payment to the Administrator.  Any

9  unexpended portion of this amount at the termination of the administration of this

10  Judgment shall revert to ACCCH or the Ameriquest Parties.

11  **4.**    The Ameriquest Parties shall provide to the Administrator all information

12  reasonably necessary for the administration of this Judgment within a reasonable

13  time not to exceed thirty (30) days after receipt of the request for information.

14  The Ameriquest Parties shall be ordered to provide this information under 15

15  U.S.C. § 6802(e) (1)(A), (5) and (8) of the Gramm-Leach-Bliley Act.  Information

16  pertaining to individual eligible Borrowers, including names and other identifying

17  information may be provided to the State but only if:

18  **a.**    The information is used solely for the purpose of contacting eligible

19  Borrowers concerning the award of restitution under this Judgment;

20  **b.**    The information consists solely of identifying information about eligible

21  Borrowers who have failed to respond to two or more written notices

22  about the restitution offer; and

23  **c.**    Any personal identifying information related to a Borrower provided to the

24  State shall be considered non-public, confidential data not subject to

25  disclosure under  California Public Records Act, Cal. Gov. Code §§ 6250

26  *et seq.*

27  **D.**    **Warranties.**  The Ameriquest Parties shall warrant to the State at the time of

28  supplying information to the Administrator that the information is complete and accurate.  If the

1  Ameriquest Parties supply information that is incomplete or inaccurate and that results in an

2  eligible Borrower receiving no restitution or less restitution than that Borrower otherwise would

3  have been entitled to receive under California's restitution plan if complete and accurate

4  information had been provided, the Ameriquest Parties shall pay the difference between the

5  restitution received by the Borrower, if any, and the amount that should have been paid had

6  complete and accurate information been provided.  The Ameriquest Parties and Plaintiff mutually

7  warrant to the other that the individuals executing the Stipulation for entry of this Judgment are

8  duly authorized to do so and that, as a result of their execution, this Judgment shall be

9  enforceable against any party.

10       **E.**    **Onsite Inspections.**  The Administrator shall permit reasonable onsite inspection

11  by the Settling States on the premises of the Administrator to monitor administration of this

12  Judgment.

13       **F.**    **Taxes.**  Income taxes, if any, on income earned by the Administrator on funds

14  held temporarily by the Administrator pending distribution as restitution shall be paid out of the

15  income earned by those funds.

16       **VI.  COMPLIANCE MONITORING**

17       **A.**    **Implementation Timeline.**  The Ameriquest Parties shall implement the changes

18  required by this Judgment as soon as reasonably feasible but not later than March 15, 2007.

19       **B.**    **Ameriquest Parties' Internal Monitoring.**  No later than ninety (90) days after

20  the Effective Date, the Ameriquest Parties shall implement a program of internal monitoring to

21  insure its compliance with this Judgment.  This program shall include, at a minimum, periodic

22  on-site visitation of branch offices, and a Mystery Shopping program (except for AMC), all

23  designed to test the Ameriquest Parties' employees' compliance with this Judgment and the

24  Ameriquest Parties' policies and procedures regarding the Loan origination and funding  process.

25       **C.**    **Customer Satisfaction Monitoring in Welcome Calls.**  The Ameriquest Parties

26  will attempt to contact, by telephone, each Borrower as his or her Loan is transferred to Loan

27  servicing.  During such calls, Loan servicing personnel will review the Borrower's Loan terms

28  with Borrowers and assess their overall satisfaction with the Loan origination and funding

1   process.  When material deficiencies or problems with the Loan origination or funding process

2   are identified, the matter will be promptly referred to a complaint resolution unit.

3        **D.**     **Appointment of an Independent Monitor.**  The Compliance Committee and the

4   Ameriquest Parties shall agree on the appointment of an independent Monitor (hereafter the

5   "Monitor") to oversee compliance with the provisions of this Judgment by the Ameriquest

6   Parties.  In the event the parties fail to reach agreement on a Monitor within ninety (90) days after

7   the Effective Date, the Compliance Committee shall appoint a Monitor.

8        Within thirty (30) days after the appointment of the Monitor, the Compliance Committee

9   and the Ameriquest Parties shall agree with the Monitor on a proposed work plan and contract,

10  which shall include all reasonable and necessary costs of the Monitor.  If the Monitor, the

11  Compliance Committee and the Ameriquest Parties fail to reach agreement within that time, the

12  Compliance Committee shall determine a fair and reasonable work plan and contract in

13  consultation with the Ameriquest Parties and the Monitor.

14       In the event of any dispute arising over the Monitor's performance or the reasonableness

15  of the Monitor's costs and fees, either an Ameriquest Party or the Monitor may request the

16  Compliance Committee arbitrate the dispute.  In such event, the determination of the Compliance

17  Committee shall be final.

18       **E.**     **Costs of the Monitor.**  ACCCH or AMQ shall pay all reasonable and necessary

19  costs of the Monitor.  Reasonable and necessary costs shall be limited to those set out in the

20  Monitor Contract, but in no event shall they exceed Two Million Dollars ($2,000,000) per

21  calendar year.  The Ameriquest Parties and the Compliance Committee may agree to the

22  performance of additional necessary work by the Monitor in an amount not to exceed One

23  Million Five Hundred Thousand Dollars ($1,500,000) for the entire Monitoring period.

24  Agreement for any additional work shall not be unreasonably withheld.

25       **F.**     **Powers of the Monitor.**

26       **1.**     The Monitor shall have broad discretion to review the Ameriquest Parties'

27            operations to ensure that each of them complies with the terms of this Judgment.

28

1    The Monitor shall have all powers reasonable and necessary to efficiently and

2    effectively discharge its responsibilities under this Judgment.

3    **2.**    The Ameriquest Parties shall provide the Monitor access to all documents

4    necessary to permit the Monitor to fulfill its duties in a manner, format and time

5    frame convenient to the Monitor.  Similarly, the Ameriquest Parties shall provide

6    the Monitor with reasonable access to their employees as the Monitor reasonably

7    determines necessary to fulfill its duties under this Judgment.  The Ameriquest

8    Parties shall make its employees available for interview, either telephonic or

9    in-person, within seven (7) business days of the Monitor's request.  Any customer

10    or proprietary information provided to the Monitor shall remain the sole property

11    of the Ameriquest Parties and shall be treated as confidential information, subject

12    to the provisions of Section VI.H and Section VIII.F.

13    **3.**    For Loan sampling purposes, the Monitor shall request the number of Loans

14    needed for a ninety-five percent (95%) confidence level, with an error tolerance of

15    plus or minus five percent (5%).

16    **4.**    The Ameriquest Parties shall provide the Monitor with private workspace and

17    access to a photocopier whenever the Monitor makes inspections of the

18    Ameriquest Parties' documents, files and other materials.

19    **G.    Oversight and Compliance.**  The Monitor shall issue a report (hereafter

20    "Report") to the Compliance Committee for the periods ending December 31, 2006; June 30,

21    2007; December 31, 2007; December 31, 2008; December 31, 2009; and December 31, 2010.

22    Each report is due three (3) months after the close of the period covered by the Report.  A copy

23    of the Report shall be submitted simultaneously to undersigned counsel for the Ameriquest

24    Parties.  The Report shall include:

25    **1.**    The Monitor's evaluation of the Ameriquest Parties' compliance with this

26    Judgment; and

27    **2.**    The factual basis for the Monitor's conclusions.

28

1    The Monitor shall confer with the Ameriquest Parties and the Compliance Committee

2  prior to issuing each Report.

3    **H.    Use of the Monitor's Reports.**  The Monitor's Reports and testimony may be

4  used by Plaintiff, ACCCH or the Ameriquest Parties in any court hearing, trial or other

5  proceeding relating to this action, and the Reports shall be admissible into evidence if there is an

6  alleged violation of this Judgment.  The Monitor's Report and testimony with respect to any

7  particular alleged violation shall not be admissible or used in any such proceeding by the State if

8  the Ameriquest Parties have cured to the reasonable satisfaction of the State the alleged violation

9  within a reasonable time, which shall be no fewer than thirty (30) days and no more than ninety

10  (90) days after receipt of the report.  Provided, however, that the Ameriquest Parties shall not be

11  afforded an opportunity to cure for the purpose of preventing the State from using the Monitor's

12  Report and testimony when the violation of the same injunctive provision is found to have

13  occurred in over ten percent (10%) of the Loan transactions reviewed by the Monitor in any one

14  state in more than one Report.  Subject to the California Public Records Act, Cal. Gov. Code §§

15  6250 *et seq.*, the Monitor's Reports shall not be disclosed to any private party without fifteen (15)

16  days prior notice to the Ameriquest Parties, to permit the Ameriquest Parties adequate

17  opportunity to object to their disclosure.  The Ameriquest Parties' remedy against the State for

18  any violation of this fifteen (15) day prior notice requirement is limited to seeking return of the

19  documents from the private party.

20    Nothing in this Judgment limits the right of the State to conduct investigations or

21  examinations independent of the work of the Monitor.

22    **I.    Retention of Documents.**  The Ameriquest Parties shall generate, retain and

23  make readily available to the State for inspection, upon reasonable notice and without the

24  necessity of a subpoena or other legal process, all material records and documents reasonably

25  necessary to document compliance with this Judgment.  The Ameriquest Parties shall maintain

26  these records and documents for a minimum of five (5) years after the Monitor's final Report.

27  ///

28  ///

## VII.  RELEASES

    **A.**    **Release from Borrowers.**  Each Borrower who receives a payment from the Settlement Fund shall first execute the following release (which shall be provided to Borrowers in both English and Spanish):

    "'We' and 'our' mean the Borrowers under the Loan account number(s) listed above.  If there is only one Borrower, these terms refer to that single Borrower.  The 'Ameriquest Parties' are Ameriquest Mortgage Company, Town and Country Credit Corporation, Ameriquest Mortgage Services, Inc., formerly known as Bedford Home Loans, ACC Capital Holdings Corporation and their respective (i) predecessors, past, present and future direct and indirect parents, owners, subsidiaries, affiliated and other related persons or entities of any kind (be they corporations, partnerships, trusts, individuals), including the successors and assigns of any of the foregoing, and (ii) all past, present and future owners, employees, officers, agents, directors, insurers, and any other representatives of all the foregoing, including, for natural persons, both in their official and individual capacities.

    By our signatures(s) below we acknowledge that we have read the following release and are bound by its terms.  In consideration for the restitution payment we are to receive, we release the Ameriquest Parties from all civil claims, causes of action, any other right to obtain any type of monetary damages (including punitive damages), expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and emotional distress), arising under any source whatsoever, including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, and whether or not alleged, threatened or asserted by us or by any other person or entity on my/our behalf, including any currently pending or future purported or certified class action in which I/we am/are now or may hereafter become a class member, that arise from or are related to the following lending practices engaged in by the Ameriquest Parties, during the period from January 1, 1999 through December 31, 2005, in connection with the Loan account numbers listed above:

All representations, misrepresentations, disclosures or any other acts, events, facts, transactions, occurrences, omissions or conduct, whether oral, written or otherwise, by the Ameriquest Parties, arising out of, in connection with or relating to any of the following:

1. Loan types and terms, including discount points, interest rates, origination-related fees, monthly payment amounts, terms of adjustable rate and fixed rate mortgages and prepayment penalties.

2. Written disclosures, including the Good Faith Estimate, other documents required to be provided to a Potential Borrower by any law or otherwise provided by an Ameriquest Party.

3. The Borrower benefits of obtaining a loan from an Ameriquest Party or from a repeat refinancing with an Ameriquest Party.

4. Coordination with debt collectors.

5. The timely completion of the underwriting functions and funding of a loan.

6. Closing of a loan.

7. Appraisals.

8. Stated income loans.

9. Disclosures to non-English speaking Borrowers and Potential Borrowers.

**Additionally,** we have read and understand Section 1542 of the California Civil Code ("Section 1542"), which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

**Notwithstanding** the above-stated provisions of Section 1542, in order to give a full and complete release and discharge to the Ameriquest Parties, we, knowingly and voluntarily, expressly waive all rights afforded to us under the provisions of Section 1542. We expressly and specifically intend for this Release to include in its effect all the claims described above that we

42

PERMANENT INJUNCTION AND FINAL JUDGMENT

1    had or might have had against any of the Ameriquest Parties at any time on or prior to the date of

2    our signing this Release, even if we neither knew nor suspected the existence of those claims at

3    that time.  This is our intent even if, had we known or suspected the existence of any claims at

4    that time, any such knowledge or suspicion would or might have materially affected our decision

5    to grant this release to the Ameriquest Parties.

6        **Also notwithstanding** this release, we may affirmatively or defensively assert any claim

7    or defense that we have with respect to my loan with an Ameriquest Party in response to a

8    judicial or threatened non-judicial foreclosure, including those related to the lending practices

9    listed in this release."

10       **B.     Release from the State.**  The relief to be provided by ACCCH and the

11   Ameriquest Parties resolves all civil and administrative investigations and proceedings, if any,

12   including those that are pending or closed, that have been or could have been brought by the

13   State against the Ameriquest Parties, as defined in the "Release from Borrowers" set forth above,

14   based upon the Lending Practices with respect to the Covered Transactions.  This release is

15   effective so long as restitution and other payments required under the terms of this Judgment are

16   timely made.  However, this release does not include a waiver or release of any civil or

17   administrative claims, regulatory matters, or causes of action relating to any practices, acts or

18   omissions by any Ameriquest Party that are not based upon the Lending Practices with respect to

19   the Covered Transactions.

20   **VIII.  MISCELLANEOUS**

21       **A.     State Authority.**  The relief provided in this Judgment, including all payments by

22   ACCCH or by the Ameriquest Parties, to the Settlement Fund or any accounts established by this

23   Judgment, is in response to and in compliance with the State of California's authority to regulate

24   ACCCH and the Ameriquest Parties and the State of California's police powers.

25       **B.     Removal of the Administrator or the Monitor.**  The Settling States reserve the

26   right to remove and replace the Monitor or Administrator upon approval of two-thirds (2/3) of

27   the number of the Settling States.

28

1    **C.    Compliance with State and Federal Law and Prior Agreements.** Nothing in

2    this Judgment shall relieve the Ameriquest Parties of their obligation to comply with applicable

3    California and federal law.  Where California statutes or regulations, letters of understanding or

4    agreements with the Ameriquest Parties, entered into and in force with the Department of

5    Corporations, Office of the Attorney General, or any of the District Attorneys provide greater

6    consumer protections than the terms or provisions included in this Judgment, then those statutes,

7    regulations, letters of understanding or agreements with the Ameriquest Parties shall govern.

8    **D.    Modification of Judgment.** This Judgment may be modified only by order of

9    this Court.  After making a good faith effort to obtain the concurrence of the other party for the

10   requested relief, which concurrence shall not be unreasonably withheld, the party seeking

11   modification may petition the Court for modification of the terms and conditions of this

12   Judgment.

13   **E.    Limitation on Use of Information from the Ameriquest Parties.** This

14   Judgment and any information provided by the Ameriquest Parties in the course of negotiating

15   the Judgment shall not be used by the State as the basis for the denial, revocation, suspension or

16   non-renewal of, or imposition of any condition on, any license, authorization, approval or

17   consent that ACCCH or an Ameriquest Party may now have, or may hereafter seek to obtain

18   under the State of California's lending, banking, insurance or similar financial laws or

19   regulations, except as expressly provided in this Judgment.

20   **F.    Disclosure of Information.** If the Office of the California Attorney General,

21   Department of Corporations, or any of the District Attorneys, receives a request for documents

22   provided by an Ameriquest Party relating to the subject matter of this Judgment, the Monitor's

23   Reports, or information obtained by the Administrator or Monitor in connection with this

24   Judgment, the office receiving the request for documents shall comply with applicable public

25   disclosure laws and promptly provide notice to the Ameriquest Parties of the request that will

26   afford the Ameriquest Parties the reasonable opportunity to assert that the documents subject to

27   the request are exempt from disclosure.

28

**G.    No Disqualification to Do Business.**  This Judgment is not intended to disqualify ACCCH or the Ameriquest Parties from engaging in any business in California.  Further, this Judgment is not intended to have any effect upon the existing ACCCH or Ameriquest Party licenses in California.  This Judgment may not be used as any basis for the denial, revocation, suspension or non-renewal of, or imposition of any condition on, any license, authorization, approval or consent that ACCCH or an Ameriquest Party may now have or hereafter may seek under California law.

**H.    Judgment Enforceable Only By the Parties.**  This Judgment may only be enforced by the Parties.  This Judgment shall not be interpreted to alter the contractual terms of any Loan agreement that any Borrower has with any of the Ameriquest Parties, or constitute a novation of any Loan agreement, except as expressly provided in this Judgment.  This Court shall retain jurisdiction to enforce the terms and conditions of this Judgment.

California may not bring an action to enforce this Judgment without first notifying ACCCH and the Ameriquest Parties in writing of Plaintiff's intent to file and of the alleged violations, specifically citing the applicable provisions of the Judgment on which the proposed action is to be based.  This notice shall be no less than fifteen (15) days prior to filing the action.

**I.    Submission to Jurisdiction for Limited Purpose.**  ACCCH and the Ameriquest Parties submit to the jurisdiction of this Court for the limited purpose of entering into and enforcing this Judgment only.  Any acts, conduct or appearance by ACCCH or the Ameriquest Parties shall not constitute or be construed as a submission to the general jurisdiction of any court or non-judicial forum in California for any purpose whatsoever.

**J.    Conflict with Subsequent Law.**  In the event that any law conflicts with any provision of this Judgment, making it impossible for ACCCH or the Ameriquest Parties to comply both with the law and with the provisions of this Judgment, the provisions of the law shall govern.

**K.    No Third Party Beneficiaries Intended.**  This Judgment is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary.

**L.    Service of Notices and Process.**  Service of notices and process required by this

1  Judgment, or its enforcement shall be served on the following persons, or any person

2  subsequently designated by the parties:

3      For ACCCH and the Ameriquest Parties:     ACC Capital Holdings Company
                                                   1100 Town & Country Road
4                                                  Orange, California 92868
                                                   Attn: Thomas J. Noto, Esquire
5                                                  Executive Vice President and
                                                   General Counsel
6                                                  Fax: (714) 479-0406

7
       For the Settling States:                   Iowa Office of the Attorney General
8                                                  Consumer Protection Division
                                                   Hoover State Office Building
9                                                  Des Moines, Iowa 50319
                                                   Attn: Patrick Madigan, Esquire
10                                                 Assistant Attorney General
                                                   Fax: (515) 281-6771
11

12     For California:                            Benjamin G. Diehl, Esq.
                                                   Deputy Attorney General
13                                                 Office of the Attorney General
                                                   300 S. Spring St.
14                                                 Los Angeles, CA  90013
                                                   Fax:  (213) 897-5548
15

16                                                 Judy L. Hartley, Esq.
                                                   Senior Corporations Counsel
17                                                 California Department of Corporations
                                                   320 W. 4th Street, Ste. 750
18                                                 Los Angeles, California 90013-2344
                                                   Fax: (213) 576-7181
19

20      **M.      Waiver/Construction.**  The failure of any party to exercise any rights under this

21  Judgment shall not be deemed a waiver of any right or any future rights.  If any part of this

22  Judgment shall for any reason be found or held invalid or unenforceable by any court of

23  competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of this

24  Judgment, which shall survive and be construed as if such invalid or unenforceable part had not

25  been contained herein.

26  ///

27  ///

28

## ORDER AND JUDGMENT

NOW, THEREFORE, based upon the advice and stipulation of the parties, and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

A.    Upon agreement of the parties, this Court hereby enters this Permanent Injunction and Final Judgment.

B.    This Court shall retain jurisdiction to enforce the terms and conditions of this Judgment.

Date: 3/21/06

Judge, California Superior Court

PERMANENT INJUNCTION AND FINAL JUDGMENT

# IMPORTANT NOTICE OF LOAN TERMS OFFERED
# BY [COMPANY]
### Date of this Notice: _____

The **TOTAL AMOUNT** of your proposed mortgage loan is $_____.

Your loan amount includes **TOTAL LENDER FEES of (BOLD/UNDERLINED) $**

[For fixed-rate loans]  Your **MONTHLY PAYMENTS** of principal and interest will be $ _____ for the life of your loan.

[For ARM loans]  Your **MONTHLY PAYMENTS** of principal and interest will be $ ___ for the first ___ [initial adjustment term], after which they may increase as your loan interest rate adjusts.

[As applicable: This amount does **NOT** include the cost of your property taxes and homeowner's insurance]

## [For fixed rate loans]

Ameriquest is offering you a loan at _____**% INTEREST**.

## [For ARM loans]

[Company] is offering you a loan starting at _____**% INTEREST**.

This loan is a fixed rate loan for [initial adjustment term].  After that the rate may adjust.  This means that after the initial period, your interest rate and loan payments can go up every [subsequent adjustment period], depending on market rates.  [As applicable: The rate will not ever go lower than _____%.]

This loan has a **PREPAYMENT PENALTY**.  This means that if you were to prepay your loan in full within [term], you could pay a charge as high as $_____.

Ameriquest is charging you $_____ **(BOLD/UNDERLINED)** in loan **DISCOUNT POINTS**, which lowers the interest rate on your loan.  You may choose a loan with fewer discount points and a higher interest rate.  Below is a comparison:

| **Loan as Presented** | | **WITH FEWEST DISCOUNT POINTS** | |
|---|---|---|---|
| Loan Amount | _____ | Loan Amount | _____ |
| Current Interest Rate | _____ | New Interest Rate | _____ |
| Discount Points ____% $ | _____ | Discount Points ___% $ | _____ |
| Monthly Payment | _____ | Monthly Payment | _____ |

**Please contact your Ameriquest mortgage specialist if you have questions about this loan proposal.**

EX A